IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LARRY WILSON, #K61439 )<br>)<br>  Plaintiff, )<br>)<br>  v. )<br>)<br>VENERIO SANTOS, WEXFORD HEALTH )<br>SOURCES, INC., TAMMY TYLER, )<br>BEVERLY HABBE, DEANA )<br>SHOEMAKER, and TISHA BRASHEAR- )<br>FINNEY. )<br>)<br>  Defendants. | Case No. 18-cv-1483-RJD |

**ORDER**

**DALY, Magistrate Judge:**

Plaintiff Larry Wilson, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983. In early 2018, Plaintiff developed abdominal pain. He ultimately underwent surgery to remove a mesh implant that had previously been placed in his lower abdomen to treat a hernia. Plaintiff alleges that Defendants were deliberately indifferent to his pain and various related complications both before and after the mesh removal surgery in violation of the Eighth Amendment to the U.S. Constitution.

This matter is now before the Court on the Motion for Summary Judgment (Docs. 123 and 124) filed by Defendants Santos, Tyler, Habbe, Shoemaker, Brashear-Finney, and Wexford Health Sources, Inc.[1] Plaintiff's Amended Complaint (Doc. 75) contains the following claims against Defendants:

> Count 1: Dr. Venerio Santos was deliberately indifferent to Plaintiff's pre-operative and post-operative abdominal pain and related

---

[1] Wexford Health Sources, Inc. ("Wexford") contracts with the IDOC to provide medical care to inmates.

complications in 2018.

Count 2: Nurse Tisha Brashear-Finney was deliberately indifferent to Plaintiff's abdominal pain when she saw him on Nurse Sick Call on January 18, 2018.

Count 4: Nurses Tammy Tyler, Beverly Habbe, and Deana Shoemaker were deliberately indifferent to Plaintiff's condition following abdominal surgery.

Count 7: Wexford promulgates and maintains certain policies, practices, procedures, and customs that ultimately led to the denial and delay of adequate medical treatment for Plaintiff's abdominal pain.

## Factual Background

The Court reviews the evidence and draws all reasonable inferences in the light most favorable to Plaintiff. *Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (internal citations omitted). Plaintiff developed a hernia in 2008 (Doc. 124-1, p. 7). In 2015, he underwent surgery in which surgical mesh was placed in his lower left abdomen (Doc. 124-2, p. 46). Plaintiff entered the IDOC in March 2017 and arrived at Centralia Correctional Center ("Centralia") later that year (Doc. 124-1, p. 6).

On January 18, 2018, Plaintiff presented to the "nurse sick call" (Doc. 134-2, p. 5). He recalls that he told Nurse Tisha Brashear-Finney that he felt like his intestines were "ripping inside" his stomach (*Id*.). Defendant Finney testified that Plaintiff did not tell her that it felt like his intestines were ripping inside his stomach (Doc. 124-4, p. 17). If he had told her that, she would have called the doctor (Doc. 124-4, p. 17). She also testified that if she thought he was experiencing "extreme" pain or if he said "I need something now," she could have scheduled him to see a doctor the next day (Doc. 124-4, p. 20). She noted that Plaintiff had not had a bowel movement in two days (Doc. 124-4, p. 17). She scheduled Plaintiff to see a physician in three

days (Doc. 124-4, p. 20).

Plaintiff saw a physician on January 21, 2018 (Doc. 134-2, p. 5). Plaintiff believes that he saw Dr. Santos on that date (Doc. 124-1, p. 41). Dr. Santos testified that he was on vacation on that date (Doc. 124-3, p. 13). Plaintiff told the doctor about the "real bad pains" he was experiencing and his prior hernia surgery (Doc. 124-1, p. 11; Doc. 134-2, p. 5). Plaintiff also told the doctor that it hurt to "use the bathroom" (Doc. 124-1, p. 11). The doctor ordered Milk of Magnesia and a stool softener for Plaintiff to address constipation, but no pain medications (Doc. 124-3, p. 14).

Plaintiff saw another physician, Dr. Garcia, on January 30, 2018 for a follow-up visit for Plaintiff's high-blood pressure (Doc. 124-3, p. 14). Plaintiff told Dr. Garcia "that it felt like my intestines [were] ripping while I'm having [a] bowel movement in my left lower abdominal area where I had my surgery" (Doc. 134-2, p. 5). Dr. Garcia prescribed Ceprol and Flagyl to Plaintiff, neither of which is a pain medication (Doc. 124-3, p. 15). According to Dr. Santos, Dr. Garcia prescribed these medications to treat diverticulitis (*Id.*). Dr. Garcia told Plaintiff he might have an infection (Doc. 134-2, p. 5).

Plaintiff saw Dr. Butalid on February 3, 2018 (Doc. 124-3, p. 15). Plaintiff informed Dr. Butalid of his "problems," that his left testicle had started hurting "real bad," and his "inner left thigh was starting to go numb" (Doc. 134-2, p. 5). Dr. Butalid ordered an x-ray of Plaintiff's abdomen (Doc. 143-2, p. 5; Doc. 124-3, p. 15).

Plaintiff saw a physician on February 7, 2018 (Doc. 124-3, p. 17). Plaintiff believes he saw Dr. Santos; Dr. Santos testified that Plaintiff saw Dr. Garcia on that date (*Id.*; Doc. 134-2, p. 5). Plaintiff told the physician that "the pains are getting worse…my left testicle won't stop hurting… my stomach felt like it was ripping in half…I had bad diarrhea," and he was having

bowel movements once every 2 days (Doc. 134-2, p. 5).  The doctor noted "counseling done….wait for official report of abdominal x-ray." (Doc. 124-3, p. 18).

Plaintiff saw Dr. Butalid on February 10, 2018 (Doc. 124-3, p. 18).  The radiologist's report stated "no acute findings" (Doc. 124-2, p. 55).  Plaintiff told Dr. Butalid "I was still in a lot of pain, having trouble getting in and out of the top bunk. I could feel my stomach ripping as I lift myself up" (Doc 134-2, p. 5).  Dr. Butalid prescribed Ibuprofen and Pepcid to Plaintiff and noted that Plaintiff would follow-up with Dr. Santos in one week (Doc. 124-3, p. 18).

Plaintiff refused to see Dr. Santos on February 16, 2018, opting instead to submit a grievance that asked Dr. Santos to "order further tests to determine what is causing the extreme pain in the area where I previously had surgery, and examine the mesh placed in my stomach" (Doc. 124-1, p. 13; Doc. 134-10, p. 4).  In the grievance, Plaintiff stated "[i]t feels like the mesh in my stomach is ripping apart and the pain is streaming to my testicle and leg. I am without any pain medication or pending tests…" (Doc. 134-10, p. 5).  The warden at Centralia treated the grievance as an emergency, but ultimately denied it on February 28, 2018, concurring with a finding by the grievance officer that "only qualified medical staff can determine care" (Doc. 134-10, p. 3).

Plaintiff then saw Dr. Garcia on February 28, 2018 and told Dr. Garcia the antibiotics were not working and he was still experiencing the same pain (Doc. 124-1, p. 13; Doc. 134-2, p. 5).  Dr. Garcia said that he was going to "put [Plaintiff] in for a CT scan" but that Plaintiff would have to see Dr. Santos, because Dr. Santos was the medical director at Centralia and "everything went through him before it went anywhere else" (Doc. 124-1, p. 13).

When a Wexford physician wants an inmate to receive certain medical treatment (e.g., a CT scan), the treatment must be approved through a process called "collegial review" in which the

referring doctor discusses the treatment with another Wexford physician, the "utilization management medical director" (Doc. 124-3, p. 8). In 2018, the utilization management medical director was Dr. Stephen Ritz (Doc. 124-3, p. 8). On March 5, 2018, Dr. Ritz and Dr. Santos discussed Dr. Garcia's request for a CT scan for Plaintiff (Doc. 124-2, p. 136). They determined they would review the request again the following week along with Plaintiff's "stool occult results, recent lab work, and commissary" (*Id.*).

Plaintiff saw Dr. Santos on March 6, 2018 (Doc. 124-3, p. 19). Plaintiff told Dr. Santos he was still in a lot of pain, "the left testical (sic) they felt like they were ripping, and the numbness was traveling further down the leg" (Doc. 134-2, p. 6). Dr. Santos testified that he gave Plaintiff "some Fibrolax," explaining "[i]t's like Metamucil to regulate" (Doc. 124-3, p. 19). Dr. Santos also recommended that Plaintiff undergo an ultrasound instead of a CT scan "because this has been going on for almost one month, and the patient was not getting any better" (Doc. 124-3, p. 19). Dr. Santos testified that he "probably" thought Plaintiff's pain was related to the prior hernia surgery, and an ultrasound would provide better information than a CT scan (Doc. 124-3, p. 19). Dr. Santos testified that he did not flag the ultrasound request as "urgent" because Plaintiff was not in acute distress (Doc. 124-3, p. 20). To determine whether Plaintiff was in acute distress, Dr. Santos felt whether his abdomen was soft; according to Dr. Santos, a "soft" abdomen indicates "there is nothing serious" occurring in the abdomen (*Id.*). Dr. Santos also looked for muscle guarding, which he explained "is when the muscles tighten, and you can see it on the face of the patient" (*Id.*). Dr. Santos noted that Plaintiff's abdomen was soft but "tender at the left lower quadrant with scar" on March 6, 2018 (Doc. 124-3, p. 19).

Plaintiff recalls that he saw Dr. Santos on March 9, 2018 and "again asked for some kind [of] pain meds told him I couldn't take it no more. I told him my only bowel movement [was]

diarrhea and the ripping and numbness still haven't went away" (Doc. 134-2, p. 6). Plaintiff's counsel points the Court to a record from this visit that states "See Clinic sheet dated this day" but the parties provide no other information to the Court regarding what transpired on March 9, 2018 (Doc. 133-1, p. 57).

On March 12, 2018, Dr. Santos presented his recommendation for Plaintiff to undergo an ultrasound to Dr. Ritz in collegial review (Doc. 124-2, p. 26). Dr. Santos saw Plaintiff on March 13, 2018 and told him that he had ordered the ultrasound (Doc. 134-2, p. 6). Plaintiff recalls that Dr. Santos "still would not give me nothing for pain" (Doc. 134-2, p. 6). The next day (March 14, 2018), Dr. Ritz approved the on-site ultrasound (Doc. 124-2, p. 26; Doc. 124-3, p. 21).

Meanwhile, Plaintiff appealed the warden's denial of his February 16, 2018 grievance (Doc. 134-10, pp. 2, 3). He sent the grievance and the warden's denial to the IDOC's Administrative Review Board, who contacted the Health Care Unit at Centralia and noted "Dr. Garcia has decided to schedule an on-site ultrasound. The date of the ultrasound has yet to be scheduled, facility needs to contact the vendor" (Doc. 134-10, p. 2). The ARB denied the appeal (*Id.*).

The Director of Nursing at Centralia scheduled Plaintiff's ultrasound for April 13, 2018 (Doc. 124-3, p. 21). The ultrasound indicated that Plaintiff had a herniated bowel (Doc. 124-3, p. 22). Plaintiff saw Dr. Santos on or around April 25, 2018 (Doc. 134-2, p. 6). Plaintiff was "still in extreme pain" and Dr. Santos explained "that my intestines [were] attached to the mesh from my previous surgery causing all the pain, he told me I needed to see a surgeon-but it had to be approved by Wexford and the prison first" (Doc. 134-2, p. 6). Dr. Santos ordered Plaintiff Ibuprofen, 600 milligrams to be taken three times per day as needed (Doc. 124-2, p. 145).

On April 30, 2018, Dr. Santos presented his request for Plaintiff to see a surgeon in

collegial review with Dr. Ritz (Doc. 124-2, p. 29).   Dr. Ritz approved the surgical evaluation (*Id*.). Plaintiff presented to Nurse Sick Call on May 9, 2018.   He reported it felt like his left testicle was "ripping out with my intestines." (Doc. 134-2, p. 6).   The nurse said "I don't know what I can do for you. I can give you these 200 milligrams Ibuprofen." (Doc. 124-1, p. 44).   Plaintiff told her that he was already taking "the 600 ones" and "they're not working." (*Id*.).

Plaintiff saw a surgeon, Dr. Merrilee Brandt, on May 18, 2018 (Doc. 124-5, p. 5, 6).   She recommended that he undergo laparoscopic repair of his recurrent left hernia (Doc. 124-5, p. 7). Plaintiff saw Dr. Santos on May 21, 2018 (Doc. 124-1, p. 15).   Dr. Santos presented the recommendation for surgery to Dr. Ritz, who approved it (Doc. 124-2, p. 33).   Dr. Brandt performed the surgery at St. Mary's Hospital in Centralia, Illinois on June 4, 2018 (Doc. 124-2, p. 45).   She found mesh from Plaintiff's prior hernia surgery protruding into his abdomen (124-2, p. 46).   She removed approximately 3-4 cubic centimeters of the mesh, leaving some mesh because of risk to the surrounding structures (Doc. 124-2, p. 46, 53).   Following surgery, Dr. Brandt prescribed Plaintiff Tramadol, 50 milligrams to be taken every four hours as needed for pain (Doc. 124-2, p. 41).   Dr. Brandt testified that Tramadol is not a narcotic (Doc. 124-5, p. 11).

Plaintiff was discharged from the hospital on the same day his surgery took place, returning to the prison infirmary at 4:00 p.m. (Doc. 134-14, p. 2).   Dr. Santos ordered Motrin (ibuprofen), 600 milligrams to be taken three times daily as needed for pain (Doc. 124-2, p. 18). Dr. Santos did not order Tramadol for Plaintiff as prescribed by Dr. Brandt because the nurse in the infirmary (Defendant Beverly Habbe, R.N.) told Dr. Santos that Plaintiff "was doing fine" (Doc. 124-3, p. 28).   Nurse Habbe testified that she "wasn't seeing anything in my assessment that really led me to believe he was in severe pain" (Doc. 124-6, p. 26).   However, at 9:00 p.m., Plaintiff told Nurse Habbe that his pain was 10/10 (Doc. 124-6, p. 27, 28).

If Nurse Habbe had told Dr. Santos that Plaintiff rated his pain at 9/10, "that would be enough" for Dr. Santos to prescribe Tramadol (Doc. 124-3, p. 28). Dr. Santos testified that "we can always change the orders from outside physicians because most of the time when we get this patient they are on opiods…we don't usually allow that here because of the addictive properties. Lots of side effects." (Doc. 124-3, p. 27). However, Dr. Santos had no reason to believe Plaintiff would become addicted to pain medication (Doc. 124-3, p. 28). Dr. Santos prescribes narcotic pain medication for "severe pain" (Doc. 124-3, p. 28).

The next day, Plaintiff did not receive any pain medication until 3:30 p.m., when the nurse gave him a Motrin (600 mg) (Doc. 134-2, p. 7). Plaintiff saw Dr. Santos and told him "my stomach was hurting real bad. That it felt like maybe I had to use the bathroom but couldn't." Dr. Santos gave Plaintiff a "drink to help me use the bathroom. That was it." (Doc. 124-1, p. 17). Nurse Habbe noted at 3:50 p.m. that Plaintiff said "I've never seen anything like this! The surgeon sent me a script for pain meds but I'm just told to lay here and suffer!" (Doc. 133-1, p. 89). The Motrin did not alleviate Plaintiff's pain "at all" (Doc. 124-1, p. 17). Defendant Deanna Shoemaker, another nurse in the infirmary, gave Plaintiff an ibuprofen. (Doc. 124-1, p. 18). He told her "it's not helping at all….there ain't nothing stronger you can give me?" (*Id.*). She replied "This is what Dr. Santos gave you….there is nothing I can do…maybe he's showing you tough love." (*Id.*).

On June 7, 2018, Plaintiff "could not take the pain anymore" and he told a nurse that he needed to see Dr. Santos to tell him the Ibuprofen did not alleviate his pain (Doc. 134-2, p. 7). Plaintiff saw Dr. Santos on June 8, 2018 and told him "my stomach is hurting" and "the medicine is not helping me any" (Doc. 124-1, p. 18). Dr. Santos thought Plaintiff "would be fine with the Ibuprofen" but prescribed Tramadol as ordered by Dr. Brandt at the "insistence of the health care

unit administrator because [Plaintiff] was filing grievances that he was not getting the medicine that was prescribed by the doctor outside" (Doc. 124-3, pp. 30, 33).

Dr. Santos also discharged Plaintiff from the infirmary to general population on June 8, 2018 (Doc. 124-3, p. 30). Dr. Santos ordered a low bunk permit for Plaintiff so that he would not have to climb to a top bunk (Doc. 124-2, p. 24; Doc. 124-3, p. 31). No low bunk permit was issued until June 25, 2018 (Doc. 124-2, p. 57). The healthcare unit administrator later investigated why the delay occurred, and testified at her deposition that a nurse neglected to complete the paperwork for the low bunk permit (Doc. 124-8, p. 31).

Following Plaintiff's surgery on June 4, 2018, he received discharge paperwork that included a follow-up appointment scheduled for June 12, 2018 at 10:30 a.m. with Dr. Brandt (Doc. 124-2, p. 38). On June 11, 2018, Dr. Santos requested approval from Collegial Review to send Plaintiff to the follow-up appointment (Doc. 124-2, p. 47). Wexford's paperwork indicates that Dr. Ritz approved the request on June 12, 2018 at 3:41 p.m (*Id.*). Plaintiff did not see Dr. Brandt for the scheduled appointment on June 12, 2018.

On June 20, 2018, Plaintiff asked a correctional officer to call the healthcare unit to see why his staples had not yet been removed (Doc. 134-2, p. 8). On June 21, 2018, Plaintiff asked another correctional officer to call the healthcare unit to see if his staples could be removed because "they were ripping and irritating" his skin (*Id.*). At 10:36 a.m. on June 21, 2018, Dr. Santos wrote an order to remove Plaintiff's staples, a procedure he describes as "fairly easy" and is commonly performed by nurses (Doc. 124-3, p. 35, 36). At 11:00 a.m., Defendant Tammy Tyler, RN attempted to remove the staples with a device referred to as a "stapler remover" (Doc. 124-2, p. 25; Doc. 124-9, p. 27). Plaintiff recalls that "while she was trying to remove [the staples] it was hurting me because the skin had grew over the staples. So they weren't just coming out." (Doc.

124-1, p. 19). As Defendant Tyler pulled on the staples, Plaintiff felt a "ripping at my stomach so bad" (*Id*.) Plaintiff told Defendant Tyler that she was hurting him, and "if you give me something I can cut the staples, you know, and pull it out." (*Id*.) Defendant Tyler gave him what "looked like big toenail clippers." (*Id*.) Plaintiff used the clippers to cut the staples, and Defendant Tyler "tweezered them out through the sides" (*Id*.)

An inmate porter appeared as Plaintiff was using the clippers, and Plaintiff asked the inmate porter to "help me" (Doc. 124-1, p. 20). Defendant Tyler told Plaintiff he was going to "get us all in trouble" (Doc. 134-2, p. 8). Defendant Deanna Shoemaker (another nurse) appeared and removed some of the staples (*Id*.). As he cut the staples, Plaintiff "clipped" his skin a few times and was bleeding (Doc. 124-1, p. 21). Defendants Tyler and Shoemaker did not bandage the cuts (*Id*.) Plaintiff returned to the housing unit, where a correctional officer noticed that he was bleeding and sent him back to the healthcare unit to be bandaged (Doc. 124-1, p. 21). Internal Affairs investigated the events surrounding the removal of Plaintiff's staples and found that Defendant Tyler violated the Standard of Conduct policy by using the toenail clippers (Doc. 134-18, p. 5).

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Discussion

"Deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To survive summary judgment, Plaintiff must first establish that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted). With regard to the first showing, the following circumstances could constitute a serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.,* 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

Plaintiff must also show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'." *Estelle*, 429 U.S. at 104

(quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  Medical malpractice is not deliberate indifference. *Id*. at 106.  Plaintiff must demonstrate "something approaching a total unconcern" by Defendants for his welfare.  *Rosario v. Braun*, 670 F.3d 819, 822 (7th Cir. 2012).  A factfinder may also conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.  *Greeno*, 414 F.3d at 653.

Defendants make no argument regarding whether Plaintiff has identified a serious medical need.  Therefore, the Court finds Defendants have conceded that Plaintiff's abdominal pain (both pre-surgery and post-surgery) and the implanted surgical mesh were serious medical needs under the deliberate indifference standard for purposes of this Order.

**Count 1: Dr. Santos**

Plaintiff waited more than four months to have portions of the pelvic mesh removed, and he contends that he was in significant pain during that time.  The record reflects that Dr. Santos did not treat Plaintiff's abdominal pain with any sense of urgency.  Of course, "delays are common in the prison setting with limited resources" and do not necessarily constitute deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 730-31 (7th Cir. 2016) (internal citations omitted).  Moreover, the Constitution does not guarantee Plaintiff will be free from pain while in prison.  *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

However, Dr. Santos' Motion for Summary Judgment must be denied in part because Dr. Santos did not order *anything* to attempt to alleviate Plaintiff's pain until April 20, 2018.  Plaintiff testified that he saw Dr. Santos on February 7, 2018, March 6, 2018, and March 9, 2018.  A reasonable fact finder could infer from the evidence that on those dates Dr. Santos knew Plaintiff was experiencing severe pain that was not relieved by medicine to address constipation, or relieved by the Ibuprofen and Pepcid ordered by Dr. Butalid.  Dr. Santos does not provide an explanation

to the Court as to why he waited until April 20, 2018 to order pain medication for Plaintiff, other than it seems that he did not believe Plaintiff was experiencing pain as severe as Plaintiff describes. Regardless, Plaintiff testified at his deposition and via affidavit that he told Dr. Santos he had significant pain.  Therefore, the issue of whether Dr. Santos disregarded an excessive risk of serious harm to Plaintiff prior to surgery is an issue for the jury.

Whether Dr. Santos was deliberately indifferent to Plaintiff's post-surgical pain is also a question for the jury.   Dr. Santos testified that he could have prescribed a narcotic pain medication to Plaintiff for "severe pain."   Though Nurse Habbe told Dr. Santos that Plaintiff was "fine" on June 4 (prompting Dr. Santos to order ibuprofen instead of Tramadol or a narcotic pain medication), Plaintiff testified that the next day he told Dr. Santos he was experiencing considerable pain.  Dr. Santos provided no explanation to the Court that suffices for summary judgment in his favor as to why he persisted in a course of treatment that was not (according to Plaintiff) relieving Plaintiff's pain from June 5-8, 2018.  Dr. Santos does not like to prescribe narcotics because of their addictive nature.   However, he admitted that he had no reason to suspect Plaintiff was at risk for becoming addicted to pain medication.   Moreover, Dr. Brandt testified that Tramadol is not a narcotic.

Plaintiff further alleges that Dr. Santos acted with deliberate indifference when he "failed to follow-up and ensure that off-site consultations and procedures were timely scheduled" and "failed to prescribe a bottom-bunk permit or ensure any issuance of a bottom bunk permit was issued and forwarded appropriately." The undisputed evidence shows that Dr. Santos did, in fact, order a bottom-bunk permit for Plaintiff.  To the extent that Dr. Santos did not "follow up and ensure" that his orders were carried out (either for the ultrasound, bottom bunk permit, or off-site appointments), Plaintiff fails to establish that such a failure constituted "something approaching a

total unconcern" for Plaintiff's welfare. Plaintiff does not identify any "context clues" (i.e., evidence that Dr. Santos "knew better") in the record that indicate Dr. Santos knew his orders were not being carried out in a timely manner by the appropriate personnel. *Petties*, 836 F.3d at 731.

Plaintiff did not see Dr. Brandt on June 12, 2018 for the scheduled follow-up appointment, perhaps because Dr. Santos did not submit the request for the follow-up appointment to collegial review until June 11, 2018. However, no evidence suggests that Dr. Santos disregarded a risk of harm to Plaintiff by waiting until June 11, 2018 to submit the request for the follow-up appointment. From the portions of the record cited by the parties, it does not appear that Dr. Santos was even aware of the scheduled June 12, 2018 appointment when he submitted the request on June 11, 2018.

Plaintiff's allegation that Dr. Santos was deliberately indifferent to Plaintiff by failing to timely remove Plaintiff's staples is also not supported by any evidence. Plaintiff's staples were removed 17 days after surgery. Plaintiff found the staple removal process to be quite painful, thinking that his skin had grown over the staples. However, while Dr. Brandt testified that she "generally" removes staples one to two weeks after surgery, she explained that generally "nothing serious" occurs if staples are left in longer. The patient just feels irritation to the skin and discomfort. The Eighth Amendment does not guarantee freedom from irritation and discomfort- even pain-while in prison. *Snipes*, 95 F.3d at 592.

In Count 1, the Court grants partial summary judgment in Dr. Santos' favor regarding Plaintiff's allegations that he was deliberately indifferent by failing to: 1) follow-up and ensure that off-site consultations and procedures were timely scheduled; 2) prescribe a bottom-bunk permit or ensure a bottom bunk permit was issued and forwarded appropriately; and 3) timely remove Plaintiff's staples. Whether Dr. Santos was deliberately indifferent to Plaintiff's pre-

operative and post-operative abdominal pain is a question for the jury.

**Count 2: Nurse Tisha Brashear Finney**

Plaintiff testified that on January 18, 2018, he told Nurse Tisha Brashear-Finney that he felt like his intestines were "ripping inside" his stomach. Nurse Finney testified that Plaintiff did not tell her that it felt like his intestines were ripping inside his stomach, but if he had, she would have called the doctor. She also testified that if she thought he was experiencing "extreme" pain or if he said "I need something now," she could have scheduled him to see a doctor the next day.

In their Motion for Summary Judgment, Defendants claim that Nurse Finney "did not observe that Plaintiff's pain was severe." Regardless, Plaintiff contends that he told her he was in severe pain. From this evidence, a reasonable fact-finder could infer that Nurse Finney disregarded a serious risk of substantial harm (i.e., severe pain) when she scheduled him to see a doctor three days later, instead of the next day or instead of calling the doctor immediately. *See Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 830 (7th Cir. 2009) (delaying treatment for a painful condition may constitute deliberate indifference) (internal citations omitted).[2] Because the parties dispute the severity of Plaintiff's condition as he presented to Nurse Finney, the Court cannot grant summary judgment in her favor.

**Count 3: Nurses Habbe, Tyler, and Shoemaker**

Plaintiff contends that Nurses Habbe and Shoemaker were deliberately indifferent to his post-surgical pain by failing to administer the Motrin to him that was ordered by Dr. Santos. No

---

[2] Certainly seeing a doctor the next day (or phoning the doctor) may not have provided Plaintiff with any relief, since months passed before (he contends) his pain subsided, despite seeing multiple doctors. Viewing all reasonable inferences in the light most favorable to Plaintiff (as the undersigned must do), the jury could infer that an immediate phone call or next day visit with the doctor would have resulted in some type of relief for Plaintiff, otherwise Nurse Finney would have no reason to schedule the next day visit or call the doctor. *Cf. Redman v. Doehling*, 751 Fed. App'x. 900, 904 (7th Cir. 2018).

evidence before the Court supports this argument. In fact, Plaintiff testified that Nurse Shoemaker brought him a Motrin. As for Nurse Habbe, Plaintiff merely points to various medical records that contain nursing notes, none of which state that Nurse Habbe refused to give him Motrin.[3]

Plaintiff further argues that Nurse Habbe was deliberately indifferent by failing to inform Dr. Santos of Plaintiff's severe post-surgical pain. Nurse Habbe testified that she did not "see anything in [her] assessment" that led her to believe that Plaintiff had severe post-surgical pain. According to her notes, though, Plaintiff told her that his pain was 10/10. She did not relay that information to Dr. Santos, who claims that he would have prescribed Tramadol if he had learned Plaintiff's pain level was 9/10. The issue of whether Nurse Habbe's failure to inform Dr. Santos of Plaintiff's 10/10 pain level constitutes deliberate indifference cannot be resolved through summary judgment because the parties dispute the severity of Plaintiff's pain.

The final issue in Count 3 that is addressed in Defendants' motion is whether Nurse Tyler and Nurse Shoemaker were deliberately indifferent during and immediately after the staple removal process. Certainly there is evidence that use of the sterile nail clippers was neither recommended nor approved. However, the record contains no evidence that either Nurse Tyler or Nurse Shoemaker were "aware of a substantial risk of serious harm" that existed by allowing Plaintiff to use sterilized toenail clippers to cut his staples. *Jones v. Matthews*, 2 F. 4th 607, 613 (7th Cir. 2021) (internal citations omitted). For example, there is no evidence that using the nail clippers put Plaintiff at a higher risk for infection, bleeding, scarring, etc. Moreover, Plaintiff testified that he found the *entire* staple removal process was painful. No evidence suggests that

---

[3] The Motrin prescription was for 600 milligrams to be taken three times daily, as needed. A note that appears to be signed on June 5, 2018 at 3:50 p.m. by Nurse Habbe references an incident that occurred earlier that day where Plaintiff requested Motrin but it was too soon for him to receive another dose. The note does not indicate whether it was Nurse Habbe or another nurse who determined it was too soon for Plaintiff to receive another dose. Moreover, declining to give a patient medicine before the prescribed time does not constitute "refusing" to give the medicine at all.

the nail clipper method caused him more pain than the traditional method first attempted by Nurse Tyler.

After Plaintiff's staples were removed, Nurse Tyler and Nurse Shoemaker sent him back to general population without bandages. Within 30 minutes, Plaintiff returned to the health care unit and received bandages after showing a correctional officer that he was bleeding. No evidence suggests that Plaintiff suffered any harm that resulted from the 30-minute delay to support a finding of deliberate indifference. *Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015) ("a delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain") (quoting *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) *and Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2010)).

Accordingly, Count 3 will proceed to trial only on Plaintiff's claim that Nurse Habbe failed to inform Dr. Santos of the severity of Plaintiff's post-surgery pain, in violation of the Eighth Amendment. Summary judgment is otherwise granted in favor of Defendants Habbe, Tyler, and Shoemaker in Count 3.

**Count 4: Wexford**

To prevail in his §1983 claim against Wexford, Plaintiff must establish that his Eighth Amendment right to be free from cruel and unusual punishment was violated by 1) Wexford's express policy; 2) Wexford's "widespread and persistent practice that amounted to a custom approaching the force of law"; or 3) a Wexford "official with final policymaking authority." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (*citing Monell*, 436 U.S. at 690-91; *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). Plaintiff argues that the collegial review process delayed his medical care.

Plaintiff first complained of pain on January 18, 2018. He underwent surgery on June 4,

2018.  During that period of four and a half months, less than four weeks were spent waiting for various collegial reviews to approve Plaintiff's appointments and procedures.  Moreover, Dr. Santos could have requested urgent collegial reviews for Plaintiff's procedures and appointments, but he did not think urgent reviews were necessary (Doc. 124-3, p. 77, 81).  Consequently, no evidence suggests that the collegial review process itself caused delays in Plaintiff's treatment.

Plaintiff also argues that Wexford has a "widespread policy of permitting delays in necessary medical treatment" but points to no evidence to support this argument. Plaintiff is attempting to hold Wexford vicariously liable for the actions of individual providers, as there is no evidence that any of those providers were following a custom or policy when they acted (or failed to act) regarding Plaintiff's care.   Like his encounters with Dr. Santos, Plaintiff's encounters with the other individual defendants indicate that they did not believe he required urgent care.  Neither Dr. Brandt nor Dr. Butalid treated Plaintiff's condition as urgent.  Simply because none of Plaintiff's providers treated his condition as urgent does not mean that Wexford has a "widespread policy" of delaying necessary medical treatment.   Other delays were attributable to human error, e.g., a nurse's failure to complete the necessary paperwork for Plaintiff's lower bunk permit.

Finally, Plaintiff contends that Wexford failed to enact policies and protocols for patients suffering from complications related to prior hernia repair surgeries and mesh implants.   Wexford may be liable "for a policy of inaction" when there is "evidence that [Wexford] made a conscious decision not to act."   *Walker v. Wexford Health Sources, Inc*., 940 F.3d 954, 966 (7th Cir. 2019) (*quoting Thomas v. Cook Cty. Sheriff's Dep't.*, 604 F.3d 293, 303 (7th Cir. 2010)).   Plaintiff points to no such evidence. Wexford is entitled to summary judgment in Count 4.

## Conclusion

Summary judgment is granted in favor of Defendants as specifically identified in the following claims, which are dismissed with prejudice:

Count 1: Plaintiff's claim against Dr. Santos that he was deliberately indifferent by failing to: 1) follow-up and ensure that off-site consultations and procedures were timely scheduled; 2) prescribe a bottom-bunk permit or ensure a bottom bunk permit was issued and forwarded appropriately; and 3) timely remove Plaintiff's staples.

Count 2: Plaintiff's claims against Defendants Tyler and Shoemaker, as well as his claim that Nurse Habbe failed to administer Motrin to Plaintiff post-abdominal surgery.

Count 4: Plaintiff's claims against Wexford in their entirety.

The Clerk of Court is directed to enter judgment accordingly at the conclusion of this matter. This case proceeds to trial on the following claims:

Count 1: Dr. Santos' alleged deliberate indifference to Plaintiff's abdominal pain, both pre-surgery and post-surgery.

Count 2: Nurse Tisha Brashear-Finney's alleged deliberate indifference to Plaintiff's abdominal pain on January 18, 2018.

Count 3: Nurse Beverly Habbe's alleged deliberate indifference for failing to inform Dr. Santos of the severity of Plaintiff's post-surgery pain.

**IT IS SO ORDERED.**

**DATED: September 2, 2021**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**